IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

RamSoft USA, Inc.,

        Plaintiff,

v.

The Radiology Group LLC,
Anand Lalaji & Joe Stephens,

        Defendants.

CIVIL NO. 1:24-cv-04821-TRJ

**PLAINTIFF'S RESPONSE IN OPPOSITION TO DEFENDANTS' MOTION
TO DISMISS SECOND AMENDED COMPLAINT**

Now comes Plaintiff, RamSoft USA, Inc., by and through its undersigned

counsel, and respectfully submits its opposition to *Defendants' Motion to Dismiss*

*Second Amended Complaint* [D.I. 71] ("Mot.").

I.    **STATEMENT OF FACTS**

Defendants' Motion to Dismiss attempts to sanitize their misconduct by

framing this action as a run-of-the-mill contract dispute where a "forthcoming"

company was transparent about its financial difficulties. Mot. p. 5. The

well-pleaded allegations of the Second Amended Complaint ("SAC")—which must

be taken as true at this stage—tell a vastly different story. Defendants did not

merely fail to pay a debt; rather, TRG, its CEO Anand Lalaji ("Lalaji"), and its

CFO Joe Stephens ("Stephens") orchestrated a deliberate, extra-contractual scheme

to fraudulently induce Plaintiff into forfeiting its termination rights by voluntarily supplying doctored financial statements and an illusory third-party funding letter.

### A.    Plaintiff's Contractual Leverage & TRG's Undisputed Default

Plaintiff develops the PowerServer, a best-in-class, cloud-based picture archiving and communication system ("PACS") for the medical field. SAC ¶8. In June 2023, Plaintiff and TRG executed a PowerServer Sales Agreement (the "Agreement"), under which TRG agreed to pay $45,000 per month for the Server and related support. *Id.* ¶¶ 11-13.

By early 2024, TRG had amassed an outstanding balance of $978,804.00 (the "Non-Payment"). *Id.* ¶23. TRG routinely acknowledged Plaintiff's invoices and never once provided a timely written dispute, waiving any right to do so. *Id.* ¶¶ 16-17, 21. Because of this severe default, Plaintiff possessed the absolute contractual right to immediately suspend TRG's access to the Server on five days' notice and to terminate the Agreement entirely. *Id.* ¶¶ 15, 18, 35.

### B.    Defendants Doctor the Financials to Hide Known Fraud

Facing the imminent suspension of the critical medical software that Lalaji personally used to treat his own patients, Defendants launched a campaign of deception to induce Plaintiff to forego its termination rights. *Id.* ¶115. To achieve this, Lalaji and Stephens voluntarily provided Plaintiff with specific Financial Disclosures that were not required under the Agreement. *Id.* ¶¶ 32, 90-91.

On January 31, 2024, Stephens, acting with Lalaji's consent and direction, sent Plaintiff a profit-and-loss statement, affirmatively representing that TRG's "financial results are improving." *Id.* ¶28. This was a blatant fabrication. While touting "improving" financials, Defendants concealed that Lalaji—TRG's CEO and a practicing radiologist using the platform—had his Kentucky medical license suspended in 2023 for missing a brain tumor, his Virginia license suspended that same year, and his Louisiana license on the verge of suspension. *Id.*   29.

Even more egregiously, on February 7, 2024, Stephens, again at Lalaji's direction, sent a year-end 2023 Balance Sheet that deliberately omitted millions of dollars in currently due-and-payable liabilities. *Id.* ¶¶ 30-31, 87. Defendants now argue to this Court that these liabilities were "purely hypothetical" simply because a federal whistleblower lawsuit happened to be under seal at the time. That is factually false. The omitted debts were not hypothetical contingencies dependent on a lawsuit—they were valid, existing obligations that were strictly required to be recorded on the TRG Balance Sheet because TRG actually owed the government the money. *Id.* ¶¶ 31, 50.

Crucially, Lalaji knew these liabilities existed because he knew he was actively committing Medicare and Medicaid fraud at the exact time he was doing it. *Id.* ¶¶ 82-84. As Lalaji explicitly admitted in his formal U.S. Department of Justice ("DOJ") settlement, he "knew" he was prohibited from billing federal

healthcare programs for scans read by unauthorized individuals, yet he "knowingly" and "illegally" submitted these improper claims anyway. *Id.* ¶¶ 41, 82. Because Lalaji and TRG knew they had received reimbursements that violated federal billing rules, they possessed actual, real-time knowledge that they had overcharged the government and owed that money back long before any DOJ case was unsealed. *Id.* ¶¶ 83-84.

Because he knew he took the money illegally, Lalaji knew these massive, multi-million-dollar "Overcharge Liabilities" were currently due and payable at the precise time these Financial Disclosures were provided to Plaintiff—so they must have been listed. *Id.* ¶¶ 31, 50. Thus, Lalaji and Stephens did not simply fail to predict the outcome of a lawsuit; they actively and intentionally doctored TRG's Balance Sheet to conceal over $3.1 million in known, admitted fraud liabilities. *Id.* ¶¶ 31, 50, 68, 80.

### C.   The Sham Five Crowns "Liquidity Event"

To induce Plaintiff to modify its agreement with TRG, Lalaji provided a Letter of Intent from Five Crowns Capital (the "FCC LOI") on January 22, 2024. *Id.* ¶27. The FCC LOI was not just a passing reference; it was a crucial piece of the February 2024 "Modification," wherein Plaintiff refrained from exercising its termination rights, reduced TRG's monthly payments to just $10,000, and converted the massive arrears into convertible debt. *Id.* ¶¶ 33-36. Crucially, this

convertible debt effectively deferred the due date for the nearly million dollars owed to Plaintiff until Defendants raised more money, such as through the Five Crowns funding. *Id.* ¶¶ 27, 33. ***Because the Modification made the convertible debt due when Defendants raised more money, the FCC LOI was a signal to Plaintiff that the cash infusion needed to pay it back was coming in the near future.***

In response, Defendants argue in their Motion that the FCC LOI cannot support a fraud claim because it was "non-binding." This argument misses the point entirely. Whether the FCC LOI was legally binding on Five Crowns or not is irrelevant; its purpose was to serve as a critical market signal. *Id.* ¶¶ 34, 52. The FCC LOI suggested to Plaintiff that the financial market had a genuine appetite for TRG, signaling that a third-party liquidity transaction was a realistic, near-term prospect. *Id.* ¶¶ 27, 34, 52. By demonstrating a seemingly viable "path" to a final exit, the FCC LOI provided the exact hope Plaintiff needed to believe the convertible debt would actually be paid, inducing Plaintiff to enter into the Modification that swapped current invoices for convertible debt and let Defendants continue using the platform, costing Plaintiff even more money. *Id.* ¶¶ 35-36, 72, 95.

In reality, Defendants knew this funding was a pipe-dream. *Id.* ¶39. Defendants deliberately hid their ongoing DOJ investigation and Overcharge

Liabilities from Five Crowns, supplying a list of pending lawsuits that entirely omitted the DOJ action. *Id.* ¶¶ 52, 54. As Five Crowns' managing director later confirmed, the undisclosed federal fraud liability would have been an absolute "deal killer." *Id.* ¶53. Because Defendants knew they were hiding a deal-killing liability from their prospective investor, they knew the FCC LOI was functionally unattainable and their "market signal" was entirely fabricated. *Id.* ¶55. Yet, they weaponized this doomed FCC LOI anyway, presenting it to Plaintiff with the specific intent to deceive Plaintiff into swapping its hard contractual leverage for worthless convertible debt (and letting Defendants run up even more debt going forward). *Id.* ¶¶ 33, 35–36, 52, 56, 85, 88. That was a misrepresentation.

### D.    Plaintiff's Reasonable Diligence and Distinct Tort Damages

Defendants don't deny this. Instead, they boldly fault Plaintiff for "blindly" relying on their misrepresentations, but Plaintiff exercised reasonable commercial diligence. *Id.* ¶¶ 73, 96.

The record belies any notion that Plaintiff was to blame. The undisclosed Overcharge Liabilities were completely undiscoverable to Plaintiff. The *qui tam* action underlying the DOJ settlement was filed under seal in 2019 and remained strictly shielded by a federal seal until March 28, 2024—well after the parties negotiated the Modification. *Id.* ¶¶ 44, 73, 96. No one at Plaintiff knew of the DOJ lawsuit; that knowledge was exclusively within the control of Lalaji and Stephens,

who possessed actual knowledge of their own fraudulent billing practices. *Id.* ¶¶ 45-47, 82-84, 86. Plaintiff, on the other hand, had no way to uncover the truth. *Id.* ¶48. Frankly, Defendants' theory makes little sense: they had hidden these liabilities from the DOJ, fought the DOJ for half a decade while knowing full well that it actually owed the money, and told no one about the liabilities. But Plaintiff was supposed to figure it out? How?

Had Plaintiff known the truth about the $3.1 million Overcharge Liabilities—which increased TRG's debt load by at least 23%—or that the FCC LOI was fraudulently procured, it never would have agreed to the Modification. *Id.* ¶¶ 49, 57. As a direct result of Defendants' fraud, Plaintiff suffered distinct economic tort injuries, including losses occasioned by the acceptance of reduced payments and the conversion of its then-current payments into convertible debt. *Id.* ¶¶ 75, 97.

### E.    Individual Defendant Liability and Personal Enrichment

Finally, contrary to Defendants' assertion that Lalaji and Stephens were mere corporate bystanders protected by the corporate veil, the SAC alleges their direct, individual participation in these torts. Lalaji and Stephens personally oversaw TRG's internal accounting, participated in the preparation of the false Financial Disclosures, and directed their transmission to Plaintiff. *Id.* ¶¶ 26, 28, 30, 86-87. Lalaji personally distributed the fraudulently procured FCC LOI. *Id.* ¶¶ 27,

85. Under Georgia law, a corporate officer who takes part in the commission of a tort is personally liable. *Id.* ¶78.

Furthermore, Lalaji extracted an independent benefit from Plaintiff's services by using Plaintiff's platform in his individual capacity to treat his own patients. *Id.* ¶¶ 115, 133. He knowingly requested and accepted the benefit of those services while fully aware that Plaintiff expected compensation, yet he failed to pay for them, resulting in his personal, unjust enrichment. *Id.* ¶¶ 116-119, 134-136.

## II.    ARGUMENT & CITATION OF AUTHORITIES

The standard for dismissal pursuant to Rule 12(b)(6) is well-established: It is only permissible when the facts alleged fail to state a "plausible" claim for relief. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

### A.    The Inducement Claims Cannot Be Dismissed.[1]

At the outset, it is important to define exactly what is being alleged here: Defendants knew they were supplying doctored financials hiding about $3 million in debt. SAC ¶¶27–28, 30–31, 50, 68, 80. Defendants knew they owed this debt because they knew that they had fraudulently charged Medicare and Medicaid. *Id.* ¶¶ 41, 82–84. Defendants also knew that they were going to have to repay it because the federal government was hot on their trail, and in fact, had been litigating with them for about five years. *Id.* ¶¶44, 84, 86. In short, Defendants

---

[1] In keeping with the Defendants' chosen approach, the negligent misrepresentation and fraudulent inducement claims are analyzed together. Mot. p. 10 n. 8.

knew they owed the money, knew the government intended to make them pay it back, and knew that they were going to have to pay it back in short order.

***Despite that, when Defendants supplied TRG's financials to Five Crowns, a venture firm, they omitted both the lawsuit and the debt despite being expressly asked about both.*** *Id.* ¶¶52, 54–55. Because Five Crowns didn't know about the lawsuit and the debt, it issued the FCC LOI, offering $34.2 million in funding. Had Five Crowns known about the lawsuit and debts—a "deal killer" situation in their words—it would not have issued the FCC LOI. *Id.* ¶53.

Defendants then presented this doomed FCC LOI to Plaintiff as evidence that their plan to obtain massive amounts of funding was, in fact, viable. *Id.* ¶56. Defendants leveraged that illusion to assure Plaintiff that cash was forthcoming and to induce Plaintiff to give up its rights to payment while keeping the system on so that Defendants could rack up even more debt. *Id.* ¶¶35–36, 52. Put simply, Defendants' misrepresentations got Plaintiff to agree to the Modification. *Id.* ¶34.

Under the circumstances, it is important to notice just how narrow Defendants' defense is. They do not claim that the pleadings do not demonstrate, or that the misrepresentations were not misrepresentations, *i.e.*, that the Balance Sheet can be explained away or that prospects were truly on the upswing. They do not claim that the pleadings establish that Five Crowns actually had all the information it needed to make its determination with respect to the FCC LOI, and

they cannot explain away the missing lawsuit data. Defendants do not contend that the pleadings suggest anything but that they furnished all this information to Plaintiff, intending that Plaintiff rely on it. Instead, Defendants claim that these outright falsehoods—the doctored Balance Sheet, the misrepresentations to Five Crowns that yielded the FCC LOI, and the statements about improving prospects—are not actionable because they were not, as a matter of law, required to be honest in their dealings with Plaintiff when seeking the Modification. According to Defendants, they can dissemble all they want to secure contract modifications—the best Plaintiff can do is to sue for breach of contract. Mot. p. 18–19.

### 1. Plaintiff's Fraudulent Inducement & Negligent Misrepresentation Claims Are Not Barred

Time out of mind, it's been the law that everybody has a duty not to lie (or negligently misrepresent) to each other for financial gain: "one who supplies information during the course of his business owes an independent duty of reasonable care to parties who rely on that information and use the information as the supplier intended."[2] *Sowa v. Mercedes-Benz Grp. AG*, 764 F. Supp. 3d 1233, 1285 (N.D. Ga. Dec. 31, 2024) (internal quotations and alterations omitted; emphasis added); *accord Monopoli v. Mercedes-Benz USA, LLC*, 2022 WL

---

[2] Defendants claim that the duty of reasonable care and competence is not specified in the SAC, however, this is incorrect. See, e.g., SAC ¶¶ 69, 77 and 93.

409484, at *15 (N.D. Ga. Feb. 10, 2022); *Robert & Co. Assocs. v. Rhodes-Haverty P'ship*, 250 Ga. 680, 681, 300 S.E.2d 503, 504 (Ga. 1983); *accord* Restatement (Second) of Torts § 552 (1977).

This is imposed by law, whether or not there is a contract. Contrary to Defendants' statement that there is "no viable legal basis to support any common-law duty not to commit fraud," that cannot be true. A common law (or other duty) not to do something is literally what a tort is. Mot. p. 11; 74 Am. Jur. 2d Torts § 10. In turn, the tort of fraud literally could not exist if there was no duty not to commit it.

In apparent recognition of this fact, Defendants try to carve out an exception, suggesting that this rule only applies to consumers, or alike. Mot. p. 10. In turn, they claim that if the lie was designed to induce "sophisticated businesses in an arm's length transaction" to enter into a contract, the liar gets a free pass. *Id.* This, however, has not been the law for at least a century: Misrepresentations made for economic gain are, in all circumstances, a tort. *Tuttle v. Stovall*, 67 S.E. 806 (Ga. 1910).

That is also why Defendants' oft-repeated claim of "repackaging" is makeweight. They cannot misrepresent to secure a contract, here the Modification—that is a tort. They also cannot fail to abide by their agreements—that is a breach of contract. One is not the other, and they can be sued

for both.[3] That both events arose during a business deal does not present a safe harbor. Ga. Contracts Law and Litigation [hereinafter "Ga. Contracts"] § 3:21 (2d ed.).

That no one is allowed to misrepresent for economic gain is precisely why the Economic Loss Doctrine does not apply to instances of fraudulent inducement or negligent misrepresentation. *Jaramillo v. Taurus Int'l Mfg., Inc.*, 2024 WL 5305081, at *7 (M.D. Ga. Sept. 27, 2024) (internal quotations omitted); *Holloman v. D.R. Horton, Inc.*, 148, 524 S.E.2d 790, 797 (1999) (holding that the Economic Loss Doctrine "is inapplicable in the presence of passive concealment or fraud."). In short, the law imposes tort liability on anyone who lies (or negligently misrepresents) facts—as Defendants did with the baseless forward-looking statements, bogus Balance Sheet and FCC LOI procured through fraud—for pecuniary gain, like the Modification.[4] *See e.g.*, *Newton v. Brighthouse Life Ins. Co.*, 2021 WL 2604654, at *5 (N.D. Ga. Mar. 11, 2021); *Mauldin v. Sheffer*, 150

---

[3] Defendants claim that prohibiting them from making false statements to induce contractual concessions would allow the exception to swallow the rule, but it is hard to see how. Had they been forthright in their business dealings, there would be no misrepresentation claims, and there would be no fraud. The issue here is that they did misrepresent material facts (knowingly or negligently) to get a contract signed. That is misrepresentation and it is wholly separate from their contractual performance.

[4] Clearly, Defendants supplied information in the course of their business, and had a pecuniary interest in the transaction. SAC ¶¶ 77, 91. That information was also entirely false. *Id.* ¶¶ 68, 80. Moreover, as it pertains to Stephens and Lalaji, as officers who took part in the events, they are personally liable. See §II(D).

S.E.2d 150, 154 (Ga. Ct. App. 1966); Ga. Contracts § 3:21. If Defendants did not wish to face tort liability, they should have told the truth about their own massive liabilities and about the prospects for future funding instead of supplying fake financials and a fraudulently obtained letter of intent.

Against this backdrop, in a last-ditch attempt, Defendants put the cart before the horse. They claim that the Economic Loss Doctrine should bar these claims because the damages are the same. Mot. p. 19. But, in making this argument, they neglect a single dispositive fact: the fraud/misrepresentation exception means the Economic Loss Doctrine does not apply so its defenses are irrelevant. *See, e.g.*, *LM Insurance Corp. v. NVA Contractors, Inc.*, 2022 WL 22831141, at *2 n.10 (N.D. Ga. June 6, 2022); *Nebo Ventures, LLC v. NovaPro Risk Sols., L.P.*, 752 S.E.2d 18, 24–25 (Ga. App. 2013) ("The damages recoverable for the alleged fraud may overlap Nebo's damages for breach of contract, … [h]owever, a plaintiff may pursue any number of consistent or inconsistent remedies … until he shall obtain a satisfaction from some of them and any election of remedies, if necessary, [can] be made before judgment." (cleaned up)); *accord* Ga. Contracts at § 3:21.[5]

Defendants' reliance on *Emmer v. WABII Branding Inc.* fails for the same reason as Courtesy and Akkad as discussed more fully below. 2022 WL 22886642,

---

[5] In note 10, Defendants wrongly argue against rescissory damages. First, it's irrelevant. *Browning v. Stocks*, 265 Ga.App. 803 (2004). Second, under Fed. R. Civ. P. 8(d)(2) and (3), a plaintiff in federal court is expressly permitted to plead alternative and inconsistent remedies at the motion to dismiss stage.

at *14 (N.D. Ga. Aug. 8, 2022). *Emmer* merely holds that a broken contractual promise is a breach of contract, not fraud. While the *Emmer* court noted the fraud and contract damages were identical, this served only as evidence that the plaintiff was improperly recasting a breach—it did not create a strict legal bar against fraud claims involving overlapping damages. Nor did *Emmer* categorically require post-formation conduct to sustain a fraud claim. *Id.* Ultimately, *Emmer* is inapposite because here Defendant did not merely fail to pay under the Modification; it actively misrepresented the Company's finances to secure it. *Emmer* does not—and logically cannot—insulate the extra-contractual, pre-formation misrepresentations used to induce an agreement.

Ultimately, Defendants' economic-loss-rule argument is premature because it depends on a merits determination that cannot be made at the pleading stage. At this juncture, the allegations must be presumed true, and Defendants therefore cannot establish as a matter of law that the recognized misrepresentation or fraud exception is inapplicable. *TTCP Energy Fin. Fund II, LLC v. Ralls Corp.*, 255 F. Supp. 3d 1285, 1290–91 (N.D. Ga. 2017); *Manhattan Const. Co. v. McArthur Elec.*, Inc., 2007 WL 295535, at 12 (N.D. Ga. Jan. 30, 2007). For that reason, Defendants' economic-loss-rule theory does not support dismissal at this stage.

## 2. Defendants' Reliance on Akkad and Courtesy is Factually, Legally & Procedurally Flawed.

Unable to overcome the independent, extra-contractual duties governing their conduct, Defendants lean heavily on two cases from this District—*Akkad Holdings* and *Courtesy Properties*—to argue Plaintiff's claims are merely "repackaged" contract claims and that Plaintiff failed to plead reasonable reliance. A close reading of the facts—and the actual briefing—in those cases proves exactly the opposite.

In *Courtesy Props., LLC v. S&ME, Inc.*, the plaintiff purchased real estate and sued the seller for fraudulent inducement for failing to disclose hazardous waste. 2020 WL 7698659, at *1. The court dismissed the fraud claim specifically because the duty to disclose the hazardous waste "solely derive[d] from Section 5.1 of the Purchase Agreement," which expressly warranted that no hazardous materials were present. *Id.* at *5–6 (emphasis added). There were no extra-contractual misrepresentations, as there were here—just guarantees within the contract that were not met. The same analysis applies to *Akkad Holdings, LLC v. Trapollo*, where the claims again arose out of guarantees within the contract that went unmet. 2021 WL 5961854, at *7 (noting the claims "relate[d] only to duties imposed under the agreement").[6]

---

[6] Defendants also overlook a key component of *Akkad*—namely that plaintiffs completely failed to brief or assert the existence of an independent legal duty in their oppositions. *See* 2021 WL 5961854, at *6. Because the Plaintiff defaulted on the argument, that court never had the occasion to analyze or apply the robust extra-contractual duties that Plaintiff has explicitly pleaded and thoroughly briefed

Here, the exact opposite is true. The PowerServer Sales Agreement is a contract for medical software. It contains absolutely no provision requiring TRG to supply Plaintiff with internal financial statements, profit and loss reports, or third-party Letters of Intent. SAC ¶¶ 32, 90. Defendants did not lie about the software or the provision of services. Instead, they misrepresented entirely extrinsic matters—TRG's external financial solvency, its secret multi-million-dollar DOJ Overcharge Liabilities, and the viability of a sham third-party infusion. Furthermore, these misrepresentations were not used to induce the underlying software Agreement; they were deployed months later to trick Plaintiff into a subsequent debt restructuring and to fraudulently induce Plaintiff to forfeit its absolute right to immediately terminate the contract and cut its losses; instead, the Modification meant Defendants could obtain even more services (and Plaintiff would suffer even more losses). *Id.* ¶¶ 32, 35-36, 52.

TRG's duty to provide accurate, non-fraudulent information did not derive from the four corners of the software Agreement. Instead, it arose because TRG voluntarily stepped outside the contract and supplied this information in the course of a business transaction, triggering the independent common-law duty of reasonable care. *Id.* ¶¶ 77, 91-93. In short, the instant circumstances are completely unlike those of either *Akkad* or *Courtesy*.

---

here. The same is true for Courtesy Properties. 2020 WL 7698659, at *6 ("Courtesy did not address this specific argument in its response brief.").

### 3.    Defendants Ignore the Limits and Scope of the Reasonable Reliance Requirement Under Georgia Law

Defendants next assert that Plaintiff's reliance fails as a matter of law. They say, Plaintiff "was well aware that TRG had been unable to make the payments …, that it knew TRG could sustain only a $10,000 monthly payment, that TRG reported a $687,153 loss the previous year, that it had over $13 million in liabilities, and that it was seeking outside funding . . . to pay its alleged outstanding debt to Plaintiff." Mot. p. 15. So, they claim, Plaintiff could not have been deceived because it knew of "TRG's precarious financial condition." *Id*.

This is yet another bold theory—it's okay not to tell the truth because Plaintiff should have caught it.

It also seems to intentionally miss the point. True, TRG was already carrying a staggering debt load. But only Defendants knew TRG was secretly carrying at least 23% more debt on top of that staggering debt load. Had Plaintiff known about this extra mountain of debt, it would have viewed this information as a "deal killer"—just like Five Crowns did. *Id.* ¶¶ 49, 53, 57, 72. But Defendants withheld that information from Plaintiff (and everyone else, it seems) to paint a fraudulently false picture of TRG's finances. Now Defendants fault Plaintiff for not catching them in the act. Put bluntly, Defendants are claiming that they are entitled to escape

tort liability because Plaintiff was gullible enough to believe them. This is not a viable legal standard, nor is it an appropriate framing of Plaintiff's obligations.

Contrary to Defendants' allegations, Georgia has long held that "a party . . . is not bound to exhaust all means at his command to ascertain the truth before relying upon the representations." *Nebo Ventures, LLC*, 752 S.E.2d at 23; *accord Pampattiwar v. Hinson*, 756 S.E.2d 246, 250 (Ga. App. 2014). This is especially when the facts are "peculiarly within the knowledge of the speaker." *Macon Chrysler-Plymouth v. Sentell*, 347 S.E.2d 639, 640 (Ga. App. 1986).

Beyond that, Defendants sidestep the fact that there was nothing for Plaintiff to find. Defendants concealed the sealed qui tam DOJ lawsuit until March 28, 2024—well after the Modification was executed—so Plaintiff could not have found that. *Id.* ¶¶ 44, 73, 96. Even if it had, Plaintiff could not have determined whether or not the allegations were true. And contacting Five Crowns would have made no difference because they had been supplied, and were working off of, the same doctored information that Plaintiff was. In short, while faulting Plaintiff for a lack of diligence, Defendants do not explain what diligence was so clearly overlooked that it should bar the claim as a matter of law, or even, for that matter any diligence that would have made a difference.

Under these circumstances, Plaintiff's diligence was eminently reasonable. Or at least there is nothing suggesting that Plaintiff's reliance was so unreasonable,

a question almost always reserved for the jury, that it fails as a matter of law. *See Nw. Plaza, LLC (MI) v. Ne. Enters., Inc.*, 699 S.E.2d 410, 416 (Ga. App. 2010) ("Issues of justifiable reliance and proper due diligence are generally for the jury, and we find that jury resolution is required in this case."); *accord Credo Tax Servs., LLC v. N. Georgia Acct. Consultants, Inc.*, 2021 WL 5033820, at *4 (N.D. Ga. July 8, 2021) (declining to find a lack of justifiable reliance as a matter of law—even where defendants argued plaintiff conducted "no due diligence at all"—because evidence that plaintiff had exchanged financial information with defendants prior to signing left open the possibility that the duty of due diligence was satisfied, and that determination "belongs to the jury").

Given as much, Defendants' thesis reduces to the idea that because Plaintiff already knew that TRG was in dire financial straits, so it could not have been tricked, something that makes little sense. Mot. p. 15. First, as noted above, Five Crowns said information about the additional debt would have killed the deal. So does Plaintiff. It appears hard, under those circumstances, to conclude as a matter of law that Plaintiff would have done the deal no matter what—and it would be impossible to come to this conclusion in this instance, as it is expressly contravened by the SAC. *See* SAC ¶57.

That leaves Defendants to find passing fault in Plaintiff's supposedly bare recital of reliance.[7] This is a red herring, however, as there is nothing bare about Plaintiff's recitals. Plaintiff pleaded myriad facts. The SAC clearly sets forth that Plaintiff a) received the Five Crowns commitment and reviewed that; b) requested and reviewed financial documents and capital-related representations from TRG before agreeing to the modified repayment structure; and c) that Plaintiff would not have done any deal if it knew the truth. *See Id.* ¶¶ 26–28, 30–32, 34, 57; *and compare McCabe v. Daimler AG*, 948 F. Supp. 2d 1347, 1368 (N.D. Ga. 2013) (Plaintiffs alleged "that they expected to receive vehicles free from design or manufacturing defects and that they would not have purchased their vehicles had they known of the defect. Thus, they have plausibly alleged justifiable reliance.").[8]

## B.    Plaintiff States a Conspiracy Claim

---

[7] As an aside, while Plaintiff's allegations are sufficient whether evaluated under Rule 8 or Rule 9(b), Defendants are wrong to assert that Rule 9(b) applies to allegations of reliance. *E.g.*, *Mullen v. GLV, Inc.*, 2018 WL 3218693, at *3 (N.D. Ill. July 2, 2018); *accord Prairie Ventures, LLC v. Liotta*, 2017 WL 11630279, at *5 (N.D. Ga. Aug. 3, 2017) (When transactions "'routinely and reasonably' rely on certain kinds of representations, dismissal based on a defendant's arguments about the sufficiency of the allegations of reliance is not appropriate.") (quoting *In re Netbank, Inc. Sec. Litig.*, 2009 WL 2432359, at *7 (N.D. Ga. Jan. 29, 2009)); *Compass Bank v. Ally Motors*, LLC, 2017 WL 10562975, at *3 (N.D. Ga. May 30, 2017).

[8] Because Plaintiff has stated plausible, surviving substantive claims against Lalaji for fraud, negligent misrepresentation, and quasi-contract, Defendants' argument that the derivative claim for attorneys' fees (Count VIII) must be dismissed is moot and should be denied.

Defendants argue that Plaintiff's conspiracy claim must be dismissed because (i) there is no viable underlying tort and (ii) the intra-corporate conspiracy doctrine bars a finding of conspiracy among TRG, Dr. Lalaji, and Mr. Stephens. Mot. p. 20–21. Both arguments are without merit.

First, Plaintiff has adequately alleged tort claims for fraudulent inducement and negligent misrepresentation arising from post-contractual conduct materially distinct from the alleged breach of contract.

Second, whatever the merits of Defendants' claim that an employee cannot conspire with its employer, it is inapplicable here. Lalaji is a stakeholder and officer, and corporations absolutely can conspire with both stakeholders and officers. SAC ¶¶3, 9; *Z-Space, Inc. v. Dantanna's CNN Ctr., LLC*, 825 S.E.2d 628, 638 (Ga. App. 2019) ("[T]his Court has recognized that a corporation can engage in a conspiracy with its own officers"); *White v. Shamrock Bldg. Sys., Inc.*, 669 S.E.2d 168, 175 (Ga. App. 2008) ("[B]ecause a corporation and its sole shareholder are two distinct persons, they may be held liable for conspiring with each other."); *see also Duvall v. Cronic*, 820 S.E.2d 780, 790 (Ga. App. 2018); 14 *Ga. Jur.* § 14:1; *Ga. Law of Torts* § 15:14.

For example, in *Northwest Plaza, LLC (MI) v. Northeast Enterprises, Inc.,* a case where false financial data had been supplied by officers of a defendant corporation, the Georgia Court of Appeals rejected an officer's argument that it

was "doubtful that a corporation can even engage in a conspiracy with its own officers." 699 S.E.2d at 418–19. The Court said, "because a corporation and its [shareholders] are . . . distinct persons, they may be held liable for conspiring with each other." *Id.* (internal quotations omitted).

In sum, "Under Georgia law, a corporation and its agents can conspire with one another." *Coast Buick GMC Cadillac, Inc. v. Mahindra & Mahindra, Ltd.*, 2013 WL 870060, at *6 (N.D. Ga. Mar. 7, 2013) ; *accord Meredian Holdings Grp., Inc. v. Pereira*, 2018 WL 11431527, at *10 (M.D. Ga. May 23, 2018).

Finally, this doctrine does not apply when a corporate conspirator pursues an independent personal stake. *See e.g., 10 Fletcher Cyc. Corp. § 4884* ("The corporation may be held liable for a conspiracy, however, where its officers, agents or employees were acting for personal reasons, or where they have an independent personal stake in achieving the object of the conspiracy."); *Dickerson v. Alachua Cnty. Comm'n*, 200 F.3d 761, 770 (11th Cir. 2000). A personal stake is present when the individual defendant profits directly from the corporate action. *Orange Lake Country Club, Inc. v. Reed Hein & Assocs., LLC*, 367 F. Supp. 3d 1360, 1372–73 (M.D. Fla. 2019). Lalaji benefitted because every dollar that he took from Plaintiff could be used to pay his substantial personal debts to the DOJ. SAC ¶¶40–42. Moreover, he personally needed these services in order to continue

reading radiographs. *Id.* ¶¶115, 133. In short, even if this doctrine applied (it does not), it would not apply to Lalaji.

### C.    Plaintiff's Quantum Meruit & Unjust Enrichment Claims Are Legally Viable

Defendants have routinely asserted that the Agreement is not binding and that no contractual relationship exists between the parties. *E.g.*, Mot. p. 3 n.3. Recognizing this theory existed, Plaintiff brought its *quantum meruit* and unjust enrichment theories as alternative claims. Despite that, Defendants have moved to dismiss the same as they pertain to Lalaji because, they assert, Lalaji did not benefit. Mot. p. 22. Although they say that the services "flowed to TRG alone," they do acknowledge that the SAC asserts that Lalaji used Plaintiff's services to treat patients. *Id.*

Under the circumstances, there is no reason why these equitable remedies would not be available. Both *quantum meruit* and unjust enrichment permit recovery for valuable services that were "knowingly accepted by the recipient," where the receipt of such services without compensation would be unjust and (in the case of *quantum meruit*) the provider expected compensation. *E.g.*, *Bedsole v. Action Outdoor Advert. JV, LLC*, 750 S.E.2d 445, 451–452 (Ga. App. 2013). Defendants do not challenge these claims as they pertain to TRG. Instead, they try to create an issue as to Lalaji by contravening the pleadings by saying that—despite what the pleadings expressly say—Lalaji did not personally benefit.

But the operative complaint says otherwise. It says Lalaji requested these services and used them to treat his patients, something Defendants acknowledge, writing, "Dr. Lalaji us[ed] Plaintiff's services, at most, solely in his professional capacity to treat patients." SAC ¶112-20; 130-36; Mot. p. 22. It says Lalaji knowingly accepted these services. *Id.* ¶117. And it says Lalaji knew compensation was required. *Id.* ¶118. So, when Plaintiff says Lalaji used the services, its fair import is that Lalaji personally used the services to read radiographs for his patients. Moreover, Lalaji acted on behalf of TRG to secure services for other TRG staff members. *E.g.*, *Id.* ¶¶ 114, 132. Under the law, Lalaji can be liable for benefits received personally and on behalf of TRG.

Demonstrating the same, the Court in *Campbell v. Ailion* had no issue letting the claims go forward. 790 S.E.2d 68, 73 (2016). There, the Court refused to dismiss a complaint alleging that defendant "as an agent . . . and/or acting for [their] own benefit, induced [plaintiff] to . . . improv[e] property owned either by [defendant] or the entity for whom [defendant] was acting as an agent . . . by promising [plaintiff] that she would be reimbursed." *Id.* And to the extent the argument is that the benefit flowed through TRG, that is of no moment. *See Bolinger v. First Multiple Listing Serv., Inc.*, 838 F. Supp. 2d 1340, 1366–67 (N.D. Ga. 2012).

Defendants' cited cases are not to the contrary. For example, *Krevolin & Horst, LLC v. Raheel* involved a company facing litigation. 1:17-CV-04235-ELR, 2019 WL 13061306, at *8–9 (N.D. Ga. Sept. 6, 2019). Its CEO hired a firm to represent the company alone; and no evidence showed that he was individually benefited. By the same token, *Pharmerica Long-Term Care, Inc. v. Krystopowicz*, rejects an unjust enrichment claim because "plaintiffs provided goods and services to the Silverstone Facilities, not defendant, who is the party to be charged in this case"—in other words, plaintiff provided pharmacy services to defendants' company, but it was not giving him the drugs personally. 2012 WL 12950329, at *6 (N.D. Ga. Aug. 29, 2012). In sum, these cases do not apply.

### D.    The Corporate Veil Does Not Shield Lalaji

Finally, with respect to veil piercing, the law is clear: it cannot protect officers from the consequences of their own actions. *Gibson-Carter v. Rape Crisis Ctr.*, 2020 WL 2815122, at *29, n.33 (S.D. Ga. May 29, 2020); *see also Caplan v. Weis*, 2015 WL 630441, at *5 (N.D. Ga. Feb. 11, 2015); Accordingly, the veil offers no protection from Lalaji's individual acts and benefits received.

[Remainder of Page Intentionally Left Blank]

## III.    CONCLUSION

WHEREFORE, Plaintiff requests that this Court enter an order denying Defendants' motion and granting such other and further relief as the Court deems just and proper.

Dated: April 1, 2026.

/s/ Mark Billion
Mark Billion (GA Bar No. 768687)
BILLION LAW
110 Traders Cross
Bluffton, SC 29909
Tel: 302.428.9400
markbillion@billionlaw.com

*Counsel for Plaintiff*

## Rule 7.1(D) Certificate of Compliance

This will certify that this brief has been prepared in accordance with the page and type limitations of the Local Rules of this Court (Times New Roman 14 point).

Dated: April 1, 2026

> /s/ Mark Billion
> Mark Billion (GA Bar No. 768687)
> BILLION LAW
> 110 Traders Cross
> Bluffton, SC 29909
> Tel: 302.428.9400
> markbillion@billionlaw.com
>
> *Counsel for Plaintiff*